# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

**UNITED STATES OF AMERICA**        **CRIMINAL NO. 6:16-cr-0051**

**VERSUS**                                **JUDGE WALTER**

**TREMAYNE CLUSE**              **MAGISTRATE JUDGE WHITEHURST**

## REPORT  AND  RECOMMENDATION

Currently pending before me for Report and Recommendation is the Motion to Suppress statements filed by defendant, Tremayne Cluse ("Cluse"), on April 25, 2016 [rec. doc. 20], and the Motion to Suppress Evidence filed by Cluse on April 22, 2016 [rec. doc. 22].  The United States of America filed opposition on May 10, 2016.  [rec. docs. 27, 28].

An evidentiary hearing was held on June 2, 2016.  Testifying for the government were Special Agent ("SA") Brandon Tullier, Justine Perkins and Ruby Malone.  Cluse testified in his own defense.

Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the motions be **DENIED**.

## I. Factual Background

Cluse was an employee of the United States Postal Service ("USPS").  He worked as a postal support employee starting in 2011 for approximately one and a half years.  He was laid off for two weeks, then offered a position as a postal carrier in Opelousas, Louisiana.

At the commencement of his employment, Cluse went through an orientation process. During his employee training, he was instructed that the USPS had the right to inspect any items brought into the postal installation, including purses, briefcases, and other containers. (Government Exhibit 2). Additionally, Cluse was instructed that vehicles and their contents brought into restricted non public areas are subject to inspection. *Id.* Postal Life Long Vehicles ("LLV") are also subject to search.

Justine Perkins ("Perkins"), who had conducted postal employee training sessions since 2007, testified that the post office had several incidents in the past where employees had stolen items from the mail. Accordingly, the postal training included a lecture on theft of mail. During this module, employees were instructed that stealing incidents would be subject to criminal prosecution. Cluse signed the course booklet used in the training held on August 17 and 18, 2011, indicating that he had attended all 15 modules. (Government Exhibit 1).

Ruthie Malone, Postmaster of the Opelousas Post Office since 2004, testified that the post office had men's and women's locker rooms. Lockers were unassigned, and employees used them on a first come, first served basis. Employees selected a locker by opening the unlocked lockers to determine which were not already in use.

Employees used the lockers to hold things such as rain gear and personal hygiene items. Cluse specifically used the locker to keep deodorant and his mail carry bag. Employees were allowed to put a personal lock on lockers, but many of them were kept

-2-

unlocked.  Some employees also placed stickers on their lockers to indicate that they were in use.

Malone testified that when a package arrived at the post office, it was scanned, photographed and placed in a staging area for parcel select packages.  Then, it was distributed to the carrier on the assigned delivery route.  Once the postal carrier arrived at the designated location, that worker would scan the package indicating where it was delivered.

In late December, 2015, Malone received a complaint that a package was missing from rural route 10, which was the route associated with the package.  Malone checked with the carrier whose scanner was used to make the computerized entry about the package.  She determined that the driver was not working on rural route 10.  Instead, Cluse was working on rural route 10 that day.  On December 23, 2015, Malone questioned Cluse, who denied knowing anything about the package.

That evening, Malone conducted a random check of the unlocked lockers in the men's locker room at the Opelousas Post Office, as she had frequently done in the past. According to Malone, she conducted random locker checks to determine which lockers were being utilized, to investigate complaints of missing mail items, and to determine if employees were bringing prohibited items onto postal property.   In one of the lockers, she discovered three parcel select packages and a check stub in Cluse's name.  Cluse had not secured the locker with a lock.  Additionally, Cluse had not placed a sticker on his locker designating it as his.

Malone did not know which locker contained Cluse's items prior to opening it and had opened other unlocked lockers prior to opening Cluse's.

Malone called her supervisor, who instructed her to report the incident to the Office of the Inspector General ("OIG").  Afterward, she sent an email to SA Tullier with the United States Postal Service, OIG (Defendant's Exhibit 1), and contacted OIG's hot line to report the mail theft.

The next morning, SA Tullier and SA Kathleen Lofton ("Lofton") arrived at the office of Cynthia Urbine ("Urbine"), supervisor of the Opelousas Post Office, and instructed her to get Cluse.  Urbine brought Cluse into her office to meet with the agents.  At approximately 8:35 a.m., the agents identified themselves to Cluse and advised him of his *Miranda*[1] rights using an OIG form.  (Government Exhibit 3).  As Tullier read the *Miranda* rights, Cluse initialed after each one.  Cluse acknowledged that he understood his rights, then signed and dated the form.

At that point, Cluse indicated that he was willing to make a statement.  He did not ask for an attorney prior to questioning.  Tullier testified that he did not physically threaten Cluse or use coercion to obtain a statement.

During questioning, the agents advised Cluse about the complaints regarding the missing package and showed Cluse a picture of the package.  Cluse initially denied knowing anything about the package.  The agents then informed Cluse about the packages which were

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

discovered in his locker.  Then, Cluse admitted taking packages from the parcel select staging area, opening them in the men's locker room restroom, and placing the packages the locker.  Each package contained cell phones and accessories which were being returned.

At about 9:05 a.m., the agents asked Cluse to take them to his locker.  Cluse claimed that he did not know his locker by number.  When Cluse entered the locker room with the agents, however, he walked to locker number 21 and opened it.  Inside the locker were two rifled packages.

Next, the agents asked Cluse where the third package was that Malone had observed the previous night.  Cluse denied knowing anything about the third package.  When the agents asked Cluse to empty his pockets, Cluse pulled out two green DuraClean 2000 pillow packs, which he later disclosed came from the packages in his locker.  He also produced a new, not yet activated, Samsung Galaxy Note 5 cell phone from his left rear pants pocket.  He first stated that the phone was his girlfriend's, but later admitted that the phone came from a rifled parcel package.

At about 9:43 a.m., the agents and Cluse returned to Urbine's office, where Cluse wrote a statement admitting his guilt.  (Government Exhibit 4).  SA Tullier testified that at no time did he physically threaten Cluse, threaten him with jail time, or coerce him to write the statement.  In the statement, Cluse acknowledged that he made the decision to freely, knowingly and voluntarily write the statement without any threats or promises having been made to him.

While Cluse was writing the statement in the presence of SA Lofton, SA Tullier searched an LLV parked within the fenced lot at the post office.  Cluse testified that mail carriers drove a different LLV every day and that he was not assigned to a particular vehicle. Inside of the LLV which Cluse's had driven on that day, Tullier found a black and gray Igloo Playmate ice chest containing three rifled packages.  Cluse identified the ice chest as his, and admitted that the cell phone in his pocket had come from one of the rifled packages.

In the handwritten statement, Cluse admitted that he had opened packages, and had placed most of them back after the fact.  (Government Exhibit 4).  He concluded his handwritten statement with an apology.  SA Tullier testified that the entire encounter with Cluse lasted approximately one hour and eight minutes.

At about 10:14 a.m., Cluse left the agents to meet with Post Office representatives to discuss his employment status.  At that time, he submitted a formal resignation to his employer.  On March 11, 2016, Cluse was charged with five counts of theft of mail by officer or employee of the U.S. Postal Service.

In the instant motions, Cluse seeks: (1) to have any statements which he might have made to any investigators and/or law enforcement officers suppressed, on the grounds that they were not freely and voluntarily made, and (2) to suppress evidence seized by law enforcement agents during a warrantless search of his work locker and ice chest.

## II. Contentions of the Parties

By the first motion, Cluse moves to suppress any statements made to law enforcement agents.  [rec. doc. 20].  He asserts that the agents spoke briefly and casually with him, but then told him that they wanted to question him about alleged criminal activity.  He states that at that time, the agents informed him that he could either speak with them or they would send him to jail.  He also contends that the agents told him that if he was sent to jail, he would remain there until he saw a judge, then later would be brought to court on criminal charges.

Additionally, Cluse argues that the agents told him that if he did not want to go to jail, he could give a statement and go home.  He states that at some point, the agents read him his *Miranda* rights and asked him to sign a statement.  He asserts that although he understood his *Miranda* rights, the officers negated *Miranda* by telling him that he could avoid jail and prosecution by giving a statement and resigning his position.  He asserts that he gave the statement because he did not want to go to jail or be prosecuted.

Cluse further argues that had he known that the matter would not have ended after he gave his statement and resigned, or that a criminal prosecution with a possible jail sentence would follow, he would not have given a statement.  Thus, he argues, his statement was not freely and voluntarily given.

As to the second motion, Cluse seeks to suppress the evidence seized from his locker and ice chest. [rec. doc. 22]. He argues that the government failed to meet its burden of proving that the warrantless searches fell within one of the exceptional circumstances

-7-

justifying such searches.  Accordingly, Cluse argues that these searches violated his Fourth

Amendment right to privacy.

### III. Analysis

### A. Suppression of Statements

Cluse argues that his statements should be suppressed, because they were

involuntarily given.  The government has the burden of proving by a preponderance of the

evidence that defendant voluntarily waived his rights and that the statements he made

were voluntary. *United States v. Sanders*, 2012 WL 1222696, at *2 (W.D. La. Mar. 7,

2012), *report and recommendation adopted*, 2012 WL 1228194 (W.D. La. Apr. 9, 2012).

Whenever the government bears the burden of proof in a motion to suppress a

statement that the defendant claims was obtained in violation of the *Miranda* doctrine, the

government need prove waiver only by a preponderance of the evidence.  *Sanders*, 2012

WL 1222696, at *2.  The sole concern of the Fifth Amendment, on which *Miranda* was

based, is governmental coercion.  *Id*.  The voluntariness of a waiver of this privilege has

always depended on the absence of police overreaching, not on "free choice" in any

broader sense of the word.  *Id*. (*citing Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515

(1986)).

There is a presumption against waiver.  *Id*. (*citing North Carolina v. Butler*, 441

U.S. 369, 373, 99 S.Ct. 1755, 1757 (1966)).  The prosecution bears the burden of proving

by a preponderance of the evidence that a defendant knowingly and intelligently waived

-8-

his Miranda rights.  *Id.* (*citing Colorado v. Connelly, supra*).  To satisfy this burden, the prosecution must introduce sufficient evidence to establish that under the "totality of the circumstances," the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it.  *Id.* (*citing  Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1136, 1141 (1986)).

In this case, Cluse seeks to have his statements to the agents excluded from presentation at trial.  Under the due process approach, courts look to the totality of circumstances to determine whether a defendant's statement was voluntary. Those potential circumstances include not only the crucial element of police coercion, but also: (1) length of the interrogation; (2) location; (3) continuity; (4) defendant's maturity; (5) education; (6) physical condition, and (7) mental health.  *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S.Ct. 1745, 1754, 123 L.Ed.2d 407 (1993); *Rogers v. Quarterman*, 555 F.3d 483, 491 (5th Cir. 2009).

Here, the evidence indicates that agents' interrogation commenced at 8:35 a.m. and concluded at approximately 10:14 a.m.  The questioning took place at the Opelousas Post Office supervisor's office.  The entire encounter between the agents and Cluse lasted approximately one hour and forty minutes.  Cluse concluded his written statement, however, at 9:43 a.m., approximately one hour and eight minutes after the interview began.  This does not constitute the crucial element of police overreaching by excessive interrogation. *Colorado v. Connelly*, 479 U.S. at 163.

Additionally, the record shows that Cluse has a high school education, is 23 years old, and has no physical or mental disabilities.  These factors show that he had the capacity to understand the warnings given to him, the nature of his rights, and the consequences of waiver.  *Rogers*, 555 F.3d at 491.

Most importantly, no evidence exists of any official, coercive conduct by the agents which made it unlikely the statement was a product of the Cluse's free choice. *Colorado v. Connelly*, 479 U.S. at 164.  There was no evidence confirming a side deal offered by the agents in exchange for Cluse's statement.  Indeed, SA Tullier specifically testified that he did not have any deal with Cluse which was not covered by the Miranda waiver.  He further testified that he never threatened Cluse with jail time if Cluse refused to talk to him.  Tullier did nothing to overbear Cluse's will and force him to make a statement.  In this regard, I find SA Tullier's testimony to be credible.

Considering the totality of circumstances, the undersigned finds that Cluse's statement was freely and voluntarily given. Accordingly, I recommend that the Motion to Suppress [rec. doc. 20] be **DENIED**.

## B. Suppression of Evidence

Cluse argues that the evidence seized from his locker and ice chest should be suppressed because the searches were *per se* unreasonable due to the fact that they were conducted without a warrant and without his consent.  The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and  seizures ....” It is well settled that the Fourth Amendment's

protection extends beyond the sphere of criminal investigations.  *City of Ontario, Cal. v.*

*Quon*, 560 U.S. 746, 760-61, 130 S.Ct. 2619, 2630, 177 L.Ed.2d 216 (2010), citing

*Camera v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 530, 87

S.Ct. 1727, 18 L.Ed.2d 930 (1967).  “The Amendment guarantees the privacy, dignity,

and security of persons against certain arbitrary and invasive acts by officers of the

Government,” without regard to whether the government actor is investigating crime or

performing another function.”  *Id.,* quoting *Skinner v. Railway Labor Executives' Assn.,*

489 U.S. 602, 613-614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).  The Fourth

Amendment applies as well when the Government acts in its capacity as an employer.

*Id.,* citing *Treasury Employees v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 103

L.Ed.2d 685 (1989).

To determine whether a defendant has a reasonable expectation of privacy

sufficient to contest the validity of a search, a court must consider whether the defendant

is able to establish an actual, subjective expectation of privacy concerning the place being

searched or the item being seized, and whether that expectation of privacy is one that

society would recognize as reasonable.  *United States v. Finley*, 477 F.3d 250, 258 (5th

Cir. 2007); *U.S. Honeycutt*, 2015 WL 5826498, *5 (W.D. La. Sept. 14, 2015).  Consent to

search is valid when it is both voluntary and an independent act of free will. *United States*

*v. Montgomery*, 777 F.3d 269, 272-73 (5th Cir. 2015); *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006).

In general terms, the exclusionary rule prohibits the introduction of evidence at trial that is derivative of an unconstitutional search or seizure[2] and thereby deters police misconduct.  *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005).  Under the fruit-of-the-poisonous-tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation.  *United States v. Jones*, 234 F.3d 234, 243-44 (5th Cir. 2000); *United States v. Toussaint*, 117 F.Supp.3d 822, 849 (E.D. La. 2015).

Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights.  *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).  In the case of a warrantless search or seizure, the burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional.  *Id*.; *United States v. Thompson*, 2016 WL 3476714, *4 (E.D. La. June 27, 2016) at 432.

Although as a general matter, warrantless searches are *per se* unreasonable under the Fourth Amendment, there are a few specifically established and well-delineated

---

[2]*United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012); *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001).

exceptions to that general rule.  *Quon*, 560 U.S. at 760-61, 130 S.Ct. 2619, 2630.  The

Supreme Court has held that, in the case of a government employer, the "special needs"

of the workplace justify one such exception.  *Id*. (*citing O'Connor v. Ortega*, 480 U.S.

709, 725, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion)).  Overall, such a

search is governed by a standard of reasonableness.  *Hensley v. City of Shreveport*, 2015

WL 1467056, at *6 (W.D. La. Mar. 30, 2015), *aff'd*, 624 F. App'x. 314 (5th Cir.2015), *as

revised* (Dec. 17, 2015) (*citing O'Connor v. Ortega*, 480 U.S. at 718, 107 S.Ct. at 1498).

In this case, the undersigned finds that the search of the Cluse's locker and ice

chest did not violate Cluse's Fourth Amendment rights.  The evidence shows that the

lockers in the men's locker room were not assigned to employees, and that any employee

could claim a locker without a lock.  When selecting a locker in which to place his

belongings, Cluse opened the unlocked lockers and looked inside to see if they were

previously occupied. He was aware that other employees used this same procedure when

selecting a locker, and he admitted that his locker could be opened at any time by other

employees.  Locker No. 21, which Cluse was using during the relevant time period, did

not have a lock and did not have a sticker indicating that it was already occupied.

Under these circumstances, Cluse had no reasonable expectation of privacy

regarding the locker.  Even if Cluse had a legitimate privacy expectation, Malone's

random search of the locker, whether for a non-investigatory, work-related purpose (such

as determining which lockers were available), or for the investigation of work-related

misconduct (such as investigating complaints of missing packages or determining if employees were bringing prohibited items onto postal property) was justified and not excessive in scope.  Accordingly, her search of Cluse's locker was reasonable.

Because the initial search of the locker was reasonable, the agents subsequent search of the locker and seizure of its contents cannot be said to be the fruit of an unlawful search. Additionally, the agents' search was justified by Cluse's consentual and voluntary opening of the locker in their presence.

As to the ice chest, the evidence shows that it was in a postal vehicle which was owned by USPS.  During training, Cluse, as well as other postal employees, were instructed that purses, briefcases and other containers on postal property were subject to inspection. Cluse was further advised that vehicles on postal property (including LLVs) and their contents were subject to inspection. Thus, the undersigned finds that Cluse did not have a reasonable expectation of privacy as to the ice chest and, consequently, such search was not a violation of his Fourth Amendment rights.

Accordingly, I recommend that the Motion to Suppress [rec. doc. 22] be **DENIED**.

## IV. Conclusion

For the reasons set forth above, it is recommended that defendant Tremayne Cluse's Motions to Suppress [rec. docs. 20, 22] be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court,  shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

Signed at Lafayette, Louisiana, this 13th day of July, 2016.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**